FILED by ___ D.C.

ELECTRONIC

**Feb 20 2006**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 05-80196-Civ-Ryskamp/Vitunac

JAMES CARNEY, et al.,

      Plaintiffs,

v.

WISE FOODS, INC.,

      Defendant.

_____/

### DEFENDANT WISE FOODS, INC.'S MOTION TO DISMISS
### SECOND AMENDED COMPLAINT AND/OR SEVER PLAINTIFFS' CLAIMS
### AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Southern District Local Rule 7.1 and Federal Rule of Civil Procedure 12(b)(6), DEFENDANT, WISE FOODS, INC. ("Wise Foods") hereby moves to dismiss the Second Amended Complaint with prejudice as to JAMES CARNEY, SERAFIN GONZALEZ, SAMUEL STANDER[1], DENNIS PIASIO, VINCENT SCALA and JOHN STANZIONE. Alternatively, pursuant to Federal Rules of Civil Procedure 20(a) and 21, Wise Foods moves to sever Plaintiffs' claims. In support of this Motion, Wise Foods states:

### I.      INTRODUCTION AND PROCEDURAL BACKGROUND

On February 18, 2005, plaintiffs filed a Complaint as a putative class action in the Circuit Court of the Fifteenth Judicial Circuit. Wise Foods timely removed the action to this Court.

The original Complaint sought a declaratory judgment and an injunction to preserve what plaintiffs claimed to be the status quo. The basis for those claims were plaintiffs' allegations that former defendant Hercules Distributing Company, Inc. ("Hercules"), Hercules predecessor (Fine

---

[1] Wise Foods and the Estate of Samuel Stander are currently finalizing a settlement agreement. Therefore, this Motion will not address Stander's claims.

Distributing, Inc.) or some other unnamed third-parties, sold each plaintiff perpetual distribution rights in South Florida for certain snack food products manufactured by Wise Foods.  Based on these alleged sales by entities other than Wise Foods, plaintiffs requested a declaratory judgment that plaintiffs and those similarly situated were the owners in perpetuity of distribution rights for Wise Foods products.

On July 18, 2005, this Court entered an Omnibus Order dismissing plaintiffs' claims for declaratory relief concluding that the action "would more properly be framed as a breach of contract claim." (D.E. #31, Omnibus Order p. 17).   The Court also rejected plaintiffs' claims for injunctive relief and determined that Snyder's was improperly named as a defendant to this action.

On August 12, 2005, plaintiffs filed their Amended Complaint.  (D.E. #35, Am. Compl.). The Amended Complaint dropped plaintiffs' class action allegations, dropped Hercules and Snyder's as defendants, but added SOH Distributing Company as a defendant.  The Amended Complaint also added seven new plaintiffs, Donald Jones, Jose Pena, Celso Guzman, Serafin Gonzalez, Rickie Lugo, Samuel Stander and Walter Adams.   In disregard of this Court's suggestion that this case should be brought under a breach of contract theory, the Amended Complaint sought damages for conversion.  (D.E. #35, Am. Compl.).

On December 12, 2005, this Court granted Wise Foods' Motion to Dismiss finding, inter alia, that plaintiffs' conversion claim was barred by the economic loss rule and suggesting that, should plaintiffs' wish to re-plead, plaintiffs plead each cause of action as a separate count. (D.E. #51, Order Granting Defendant Wise Foods, Inc.'s Motion to Dismiss, p. 4).

Plaintiffs have now filed a Second Amended Complaint dropping SOH Distributing Company as a defendant and dropping the following plaintiffs: Donald Jones, Jose Pena, Celson

Guzman, Rickie Lugo, Walter Adams, and Gregory Szatkowski.   (D.E. #57, Second Am. Compl.).   Rather than pleading separate counts based on identifiable causes of action, the Second Amended Complaint confounds several causes of action into single counts separated and set forth by each plaintiff's name.   Thus, plaintiffs have disregarded this Court's directive that "[s]hould Plaintiffs wish to re-plead, the Court encourages Plaintiffs to state each cause of action as a separate count."   (D.E. #51, Order Granting Defendant Wise Foods, Inc.'s Motion to Dismiss, p. 4).

The Second Amended Complaint, however, is fraught with more than mere technical pleading problems.   The averments in the Second Amended Complaint are so argumentative, ambiguous and, outright unintelligible, that it fails to state any cause of action at all.   What appears to be plaintiffs' strategy – to present their claims in a sufficiently confusing manner so as to avoid dismissal – has backfired.   Plaintiffs have drafted the Second Amended Complaint in a manner so confusing that it fails to give Wise Foods fair notice of the nature of the claims alleged against it or the nature of the relief sought against it, thereby requiring dismissal under well-settled law that a complaint must give the defendant fair notice of the claims.

However, the ambiguous manner in which the Second Amended Complaint was drafted is more likely the result of the obstacle plaintiffs' have faced from the inception of this action – that plaintiffs have <u>no</u> written distribution agreement nor any enforceable oral agreement with Wise Foods.   Therefore, plaintiffs find themselves unable to plead a straight forward cause of action for breach of contract, as this Court previously suggested, and have resorted to attempts to bundle up in single counts elements sounding in breach of contract, ratification, reformation and multiple other claims and causes of action.   Plaintiffs, in effect, plead everything while at the same time nothing at all.

Additionally, as discussed in more detail below, whatever plaintiffs claims are, they fail as a matter of law pursuant to Florida's statute of frauds and case law regarding ratification. Moreover, the claims of plaintiffs James Carney and Dennis Piasio, also fail pursuant to Florida's law regarding reformation.

## II.  THE ALLEGATIONS OF THE SECOND AMENDED COMPLAINT AND DOCUMENTS CENTRAL TO PLAINTIFFS' CLAIMS

Wise Foods manufactures and sells food products in South Florida.  (D.E. #57, Second Am. Compl. ¶5).  Until recently, however, Wise Foods did not distribute its own products. Instead, Wise Foods engaged the services of an independent "Master Distributor." (D.E. #57, Second Am. Compl. ¶6-7).  Several decades ago, the Master Distributor in South Florida was non-party Fine Distributing.  (D.E. #57, Second Am. Compl. ¶6).  On or about 1987, Hercules purchased the exclusive rights to distribute Wise Food products in the South Florida area from Fine Distributing.  (D.E. #57, Second Am. Compl. ¶7).

Accordingly, the only entity in recent times that had a written agreement with Wise Foods was Hercules.  This agreement was called the "Master Distributor's Agreement." Pursuant to this agreement, Hercules was the "Master Distributor" for Wise Foods products in South Florida at both the wholesale level and retail-distributor level.  (See Master Distributor's Agreement (the "Master Agreement") attached as Ex. "A" to the Second Am. Compl., D.E. #57). Article 1, section 1.3 of the Master Agreement provided Hercules with the right, as an independent contractor, to distribute certain Wise Foods products within specified geographical areas in South Florida.

Article 2, section 2.2, provided that the distribution rights could only be exercised pursuant to the terms of the Master Agreement and further, that the distribution rights ended upon termination of the Master Agreement.  Article 12 of the Master Agreement stated that the

parties intended to create an independent contractor relationship, not an agency relationship. Significantly, the Master Agreement expressly provided that neither party had the right "to do any act or thing that would bind the other." (See Ex. "A" to Second Am. Compl., Art. 12).

Hercules, as well as its predecessor, Fine Distributing, were both permitted to resell portions of their retail-level distribution rights to individuals such as plaintiffs. (D.E. #57, Second Am. Compl. ¶¶8-11). In turn, some of these "route owners," resold their retail-level distribution rights to other route owners. (D.E. #57, Second Am. Compl. ¶19). All of the named plaintiffs acquired their claimed rights from retail distribution agreements with either Fine Distributing, Hercules or previous route owners. (D.E. #57, Second Am. Compl. ¶4).[2] Like the previous complaints, the Second Amended Complaint is devoid of any allegation that plaintiffs have any written distribution agreements with Wise Foods.

## PLAINTIFFS' AGREEMENTS WITH FINE DISTRIBUTING AND HERCULES

Although it is unclear from the Second Amended Complaint whether plaintiffs' claims are based on their distribution agreements with Fine Distributing or Hercules, Wise Foods will briefly describe these agreements below since these are the written agreements that plaintiffs have provided in support of their claim to distribute Wise products.

- Plaintiff Serafin Gonzalez entered into a written agreement with **Fine Distributing** in 1983 titled "Distribution and Service Agreement." (See copy of this agreement attached as Ex. "G" to the Second Am. Compl., D.E. #57). Similarly, James Carney and Dennis Piasio entered into written agreements with **Fine Distributing** in 1987, titled

---

[2] As discussed herein, Hercules could also sell portions of its wholesale distribution rights. If it did so, however, a new Master Distribution Agreement was required to be signed with Wise Foods.

WPB#639852.3                                                5

"Distribution and Service Agreement."   (See copies of these agreements attached as Exhibits "K" and "O," respectively, to the Second Am. Compl., D.E. #57).

- Plaintiffs John Stanzione and Vincent Scala entered into written agreements with **Hercules** in October 1989 and March 1993, respectively.   (See copies of these agreements attached as Exhibits "T" and "D," respectively, to the Second Am. Compl., D.E. #57).

As to all of these agreements, the Second Amended Complaint is devoid of any allegation that Wise Foods signed these agreements, executed any writing that assumed any obligations under these agreements or any writing that ratified the terms of these agreements or any allegation that Wise Foods had knowledge of the exact terms of these agreements.

## THE TERMINATION OF THE MASTER AGREEMENT

Some time after allegedly selling certain retail level distribution rights to the plaintiffs, Hercules failed financially and, as a result, Wise Foods terminated the Master Agreement.  (D.E. #31, Omnibus Order p. 4).   On March 8, 2002, Wise Foods and Hercules entered into a Settlement Agreement.   (See Ex. "A" to this Motion).   Contrary to plaintiffs' unsupportable allegations that under the Settlement Agreement, upon Hercules' ceasing operations, Wise Foods "stepped into the shoes" of Hercules, the Settlement Agreement expressly provided under section 6 titled "No Assumption of Liabilities" as follows:

> **This transaction constitutes a sale of certain assets only.  The Buyer is not assuming any liabilities or obligations of Seller of any kind or nature (including trade payables) incurred by Seller in connection with the operation of the Business prior to Closing, or other wise incurred by Seller, other than the liabilities or obligations expressly assumed by Buyer pursuant to the terms of this Settlement Agreement**.  Buyer is not assuming any obligations whatsoever with regard to any of Seller's employees; provided that Buyer shall have the option to make offers to employ any of Seller's employees on and after the Closing.  Buyer represents to Seller that any of Seller's employees hired by Buyer shall be provided with the same benefits currently

being provided to comparable new employees of Buyer; however, with respect to health benefits such employees will become immediately eligible for coverage without any prior waiting period. **Buyer is not assuming any agreements between Seller and its independent jobbers; however, Buyer shall offer new agreements to each of said independent jobbers on terms reasonably satisfactory to Buyer and, in the case of any independent jobbers who have purchased routes from Seller, such agreements will acknowledge the ownership interest of such independent jobbers in their routes**. (Emphasis added).

Under the above section, the Settlement Agreement expressly put all parties on notice that Wise Foods was not assuming any of Hercules' liabilities. With regard to independent jobbers such as plaintiffs, the Settlement Agreement provided that Wise Foods could offer independent jobbers the opportunity to enter into new agreements on terms acceptable to Wise Foods and, if the independent jobbers signed, Wise Foods would recognize their rights in the new agreements. The plaintiffs in this case, however, did not enter into new agreements with Wise Foods yet seek the benefit they might have received had they done so.

## RECENT EVENTS

After determining that it could no longer maintain an independent distribution network in Florida, Wise Foods began sending termination letters, in December 2004, to independent jobbers, including plaintiffs, explaining that their distribution routes were terminated as of March 2005. (See copies of some of these letters attached as compound Exhibits "F" "J" and "N" to the Second Am. Compl., D.E. #57). Contrary to plaintiffs' allegations, these letters did not acknowledge that plaintiffs owned any rights. Wise Foods' termination letters did, however, offer plaintiffs the opportunity to interview with Snyder's of Hanover. Id.

## III.   STANDARD OF REVIEW

When examining a motion to dismiss, the Court must accept the plaintiffs' allegations as true. The Court, however, need not accept facts that are internally inconsistent, allegations that

run counter to facts of which the Court may take judicial notice, conclusory allegations, unwarranted deductions or mere legal conclusions.  U.S. v. J.F.K. Medical Center, 16 Fla. L. Weekly Fed. D174 (S.D. Fla. 2002) (citing Campos v. I.N.S., 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998)).  The motion may be granted when the plaintiff can prove no set of facts to support his claim.  Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99 (1957).

The Court is free to look at documents referred to in the Second Amended Complaint that are central to any claims made without converting the motion into a summary judgment motion. Day v. Taylor, 400 F.3d 1272 (11th Cir. 2005).  The Court may also consider previous orders and other items appearing in the record of the case.  Watson v. Bally Mfg. Corp., 844 F. Supp. 1533, 1535 n.1 (S.D. Fla.1993), aff'd, 84 F.3d 438 (11th Cir. 1996).  Each of the documents referenced herein or attached hereto fall within these exceptions to the "four corners" rule and, in fact, the majority have already been referenced, without objection, in this Court's prior orders. (D.E. #31, Omnibus Order, and D.E. #51, Order Granting Defendant Wise Foods, Inc.'s Motion to Dismiss).

## IV.    ARGUMENT

### A.    The Second Amended Complaint Fails To Give Wise Foods Fair Notice Of The Claims Against It.

While the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim, the Rules do require a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.  Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103 (U.S. 1957) (Emphasis added).  The Eleventh Circuit Court of Appeals has recognized that the failure of a plaintiff to identify his claims with sufficient clarity to enable the defendant to frame a responsible pleading

constitutes shotgun pleading.  <u>Sledge v. Goodyear Dunlop Tires North America, Ltd.</u>, 275 F.3d 1014, 1018 n.8 (11th Cir. 2001).

The Second Amended Complaint should be dismissed because it fails to give Wise Foods fair notice of the nature of plaintiffs' claims and the grounds upon which they rest.  It is drafted in a manner so ambiguous that it is outright unintelligible and impossible to respond to.  The Second Amended Complaint is the perfect example of a shotgun pleading.

For example, it is unclear whether plaintiffs still claim that Wise Foods ratified their agreements with Hercules, Fine Distributing or other third parties, and, therefore, breached those agreements by either failing to continue providing them product for distribution on a perpetual basis <u>or</u> whether Wise Foods breached such agreements by selling specific distribution routes to SOH.  <u>Or</u>, whether plaintiffs have dropped their claim to perpetual rights and are now claiming that whatever agreements plaintiffs had with Hercules, Fine Distributing or other parties, have terminated and, for some unintelligible reason, Wise Foods is required to refund plaintiffs the principal they allegedly paid to Hercules or Fine Distributing pursuant to such agreements.  <u>Or</u>, whether plaintiffs claim that pursuant to Wise Foods' Settlement Agreement with Hercules, Wise Foods somehow entered into an unwritten agreement with them.  <u>Or</u>, whether plaintiffs claim that they have some sort of oral agreement with Wise Foods acknowledging that they own distribution rights to Wise products and Wise Foods breached that oral agreement by either failing to continue providing them product for distribution on a perpetual basis or for a certain time period or by selling specific distribution routes to SOH.  <u>Or</u>, whether plaintiffs just seek to hold Wise Foods liable for any and every agreement Hercules' ever entered into pursuant to some drawn out theory of ratification.

But even if Wise Foods were to guess at which one of these theories plaintiffs' are attempting to set forth, plaintiffs' claims would still fail because, as discussed below, the Second Amended Complaint states no cause of action at all under Florida law.

Further, it is also unclear what relief plaintiffs seek.  Plaintiffs have mixed their allegations of damages so that it is unclear whether they want the fair market value of their alleged distribution rights, loss profits or the return of the purchase price.  Some of these damages are plainly inconsistent with one another yet plaintiffs nevertheless lump them all together in one amorphous pile.

Accordingly, the Second Amended Complaint should be dismissed for failure to give Wise Foods fair notice of the claims stated and the nature of the relief sought.

**B.**       **The Second Amended Complaint Fails To State Any Claim Upon Which Relief Can Be Granted.**

Because plaintiffs have <u>no</u> written distribution agreement nor any enforceable oral agreement with Wise Foods, plaintiffs are unable to plead a cause of action for breach of contract, as this Court previously suggested.  Instead, plaintiffs' confound in single counts, <u>labeled by each plaintiffs' name</u>, elements sounding in breach of contract, ratification and reformation.  For the following reasons, Plaintiffs' claims, whatever they are, are barred by Florida's statute of frauds and case law regarding ratification.  Moreover, the claims of plaintiffs, James Carney and Dennis Piasio, also fail pursuant to Florida's law regarding reformation.

**1.**       **All Plaintiffs' Claims Are Barred By Florida's Statute Of Frauds.**

Florida's statute of frauds, section 725.01, is titled "Promise to pay another's debt, etc.," and provides as follows:

> **No action shall be brought** whereby to charge any executor or administrator upon any special promise to answer or pay any debt or damages out of her or his own estate, or **whereby to charge the defendant upon any special promise to**

WPB#639852.3                                               10

**answer for the debt, default or miscarriage of another person** or to charge any person upon any agreement made upon consideration of marriage, or upon any contract for the sale of lands, tenements or hereditaments, or of any uncertain interest in or concerning them, or for any lease thereof for a period longer than 1 year, **or upon any agreement that is not to be performed within the space of 1 year from the making thereof,** or whereby to charge any health care provider upon any guarantee, warranty, or assurance as to the results of any medical, surgical, or diagnostic procedure performed by any physician licensed under chapter 458, osteopathic physician licensed under chapter 459, chiropractic physician licensed under chapter 460, podiatric physician licensed under chapter 461, or dentist licensed under chapter 466**, unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized.**

§ 725.01, Fla. Stat. (2005). Accordingly, section 725.01, bars the enforcement of oral agreements to pay the debt of another and bars the enforcement of oral agreements that cannot be performed within the space of one year.   A court is free to dismiss a complaint based on the statute of frauds when the complaint affirmatively shows on its face that it is based on an oral contract. Martin v. Highway Equip. Supply Co., 172   So.2d 246 (Fla. 2d DCA 1965) (holding that defendant may raise statute of frauds on a motion to dismiss if shown on face of complaint).

From what Wise Foods is able to discern from the Second Amended Complaint, plaintiffs appear to be claiming that Wise Foods is liable for the debts of Hercules and Fine Distributing. In support of this claim, plaintiffs repeatedly assert that Wise Foods "verbally" told plaintiffs that it would honor their agreements with Hercules and Fine Distributing.  (See D.E. # 57, Second Am. Compl. ¶¶ 27, 43, 64, 83, 105, 126).   Such a claim amounts to an oral promise by Wise Foods to answer for the debt another, Hercules and Fine Distributing, and is unenforceable pursuant to the statute of frauds and well-established Florida law.  See, e.g., Goldstein v. Abco Const. Co., Inc., 334 So.2d 281 (Fla. 3d DCA 1976) (dismissing complaint under section 725.01).

The Second Amended Complaint is devoid of any allegation that Wise Foods executed any writing assuming Hercules' or Fine Distributing's obligations under plaintiffs' distribution agreements or that Wise Foods executed any writing promising to pay the debts of either entity. To the contrary, to the extent that any writings are identified, these writings specifically state that no enforceable obligation would come into being in the absence of a written contract with Wise Foods.

Further, even if an oral agreement by Wise Foods' to honor plaintiffs' distribution agreements with Hercules and Fine Distributing was not already unenforceable as an oral promise to pay the debt of another, it is clear from the allegations of the Second Amended Complaint that such an oral agreement is not capable of being performed within one year. Accordingly, its enforcement would be barred under the other component of Florida's statute of frauds which bars the enforcement of oral agreements that cannot be performed within the space of one year.

This is especially true here where section 725.01 has been held to apply to the precise type of distribution agreements at issue in this case.  Coleman Company, Inc. v. Cargil International Corp., 731 So. 2d 2 (Fla. 3rd DCA 1998) (holding that an oral product distribution contract was unenforceable under s.725.01).  Such contracts must be in writing and signed by the party to be charged.  All Brand Importers, Inc. v. Tampa Crown Distributors, Inc., 864 F.2d 748 (11th Cir. 1989).

Therefore, to have any claim, plaintiffs must at least allege that they have a written distribution contract signed by Wise Foods – the party to be charged.  The Second Amended Complaint is devoid of any such allegation since all those persons who had direct agreements with Wise Foods were required to arbitrate their claims and are no longer part of this case.  (D.E.

#31, Omnibus Order pp. 20-23).   Accordingly, plaintiffs' claims are barred by Florida's statute of frauds.  Goldstein, 334 So.2d at 281-82 (dismissing complaint pursuant to section 725.01).

Plaintiffs, however, try to avoid the application of the statute of frauds by arguing that Wise Foods ratified their agreements with Hercules and Fine Distributing, but for the reasons below, this claim also fails.

### 2.   The Second Amended Complaint Fails To State A Claim For Ratification.

In the Second Amended Complaint, Plaintiffs appear to try to claim that Wise Foods is liable under agreements between plaintiffs and Hercules or Fine Distributing because "[f]or the decades that this 'buying and selling' of rights took place, Wise knew of, and benefited from the practice which increased sales of its products ... Wise created both actual and apparent authority in its agent Hercules to approve these sales and otherwise ratified these sales."  (D.E. # 57, Second Am. Compl. ¶ 21).   Moreover, "[w]hen Wise bought out Hercules, Wise acted as, and stepped into the shoes of Hercules."  (D.E. # 57, Second Am. Compl. ¶¶ 64, 83, 105, 126). Plaintiffs also allege that Wise Foods continued to operate Hercules' warehouse and collected payments from independent jobbers, such as plaintiffs, after the Master Agreement had terminated.  (D.E. # 57, Second Am. Compl. ¶ 25).

This claim for ratification fails for two reasons 1) Hercules had neither actual nor apparent authority to contract on behalf of Wise Foods or to otherwise bind Wise Foods to the terms of agreements between plaintiffs and Hercules or Fine Distributing - plaintiffs own agreements evidence their knowledge of this fact; and 2) the Second Amended Complaint is devoid of any allegation that Wise Foods was informed of or approved of the specific terms of the agreements between plaintiffs and Hercules or Fine Distributing.

**Hercules Had No Actual Authority**

While plaintiffs may allege that Hercules had authority to contract on behalf of Wise Foods or to otherwise bind Wise Foods to the terms of agreements between plaintiffs and Hercules or Fine Distributing, the Master Agreement between Wise Foods and Hercules, which was referenced in plaintiffs' contracts with Hercules, says the opposite. Article 12 of the Master Agreement stated that the parties intended to create an independent contractor relationship, <u>not</u> an agency relationship. Significantly, the Master Agreement expressly provided that neither party had the right "to do any act or thing that would bind the other."

Throughout the Master Agreement, Wise Foods made clear that Hercules had no authority to contract on its behalf or to otherwise enter into an agreement that would be binding on Wise Foods. For example, under Article 9, section 9.1, which plaintiffs point to as the basis of their claims in this case, if Hercules ever sold its master distribution rights, outright, to a third party, Hercules was required to surrender to Wise Foods, <u>in</u> <u>writing</u>, its rights under the Master Agreement. Wise Foods would then enter into a <u>new</u> <u>written</u> master distribution agreement <u>directly</u> with the new master distributor. Plaintiffs, however, have no such agreement with Wise Foods.

Similarly, in the Settlement Agreement between Wise Foods and Hercules, Wise Foods again made clear that Hercules did not have, nor ever had, the authority to contract on Wise Foods' behalf. Under section 6 of the Settlement Agreement, Wise Foods clearly provided that with regard to independent jobbers such as plaintiffs, Wise Foods would enter into distribution agreements with them <u>directly</u> on terms acceptable to Wise foods and that <u>only</u> upon execution of these direct agreements would Wise Foods have any obligations. Thus, Wise Foods was never a party to Hercules' retail distribution agreements with independent jobbers, such as

plaintiffs, nor bound by the terms of those agreements.  In the Settlement Agreement, Wise Foods made clear its intent to enter into its own distribution agreements with independent jobbers, such as plaintiffs, under its own terms.  Plaintiffs cannot claim the benefit of a written agreement with Wise Foods when they never signed one.

## Hercules Had No Apparent Authority

Apparent authority requires 1) representation by the purported principal, 2) reliance on that representation by a third party, and 3) a change in position by the third party in reliance on the representation.  Robbins v. Hess, 659 So. 2d 424 (Fla. 1st DCA 1995).  Plaintiffs cannot plead or establish any of these elements.  Wise Foods never made any pre-contractual representations to plaintiffs nor anyone else that it intended to be bound by the terms of plaintiffs' agreements with Hercules or Fine Distributing – and plaintiffs do not plead that it did. Instead, the Master Agreement, which is referenced in plaintiffs' agreements with Hercules and Fine Distributing, made clear that Hercules had no authority – actual or apparent – to act on behalf of Wise Foods for the purpose of binding it to the terms of Hercules' agreements with independent jobbers such as plaintiffs.  As discussed above, both the Master Agreement and the Settlement Agreement clearly established that Wise Foods intended to be bound only by the terms of its own written agreements with independent jobbers such as plaintiffs and only when the agreements were in writing.

Plaintiffs are also unable to plead reliance.  The Master Agreement, which was referenced in plaintiffs' contracts with Hercules as being the source of any rights Hercules had to offer, specifically notified plaintiffs that Hercules had no authority to bind Wise Foods. Moreover, section 6 of the Settlement Agreement specifically provided that Wise Foods was not assuming any of Hercules' liabilities.  With regard to independent jobbers, the Settlement

Agreement clearly provided that Wise Foods could enter into distribution agreements with them directly on its own terms if it chose to do so.

### There Was No Ratification

First, ratification requires proof that the principal was fully informed of the acts of the unauthorized agent and specifically approved of such acts. Frankenmuth Mut. Ins. Co. v. Magaha, 769 So. 2d 1012 (Fla. 2000). As previously noted, the Second Amended Complaint is devoid of any allegation that Wise Foods was informed of or approved of the specific terms of any of the agreements between plaintiffs and Hercules or Fine Distributing. Plaintiffs allege only that Wise Foods was aware that the "buying and selling" was taking place. Without having any knowledge of the specific terms of these agreements, Wise Foods could not have approved of them or have agreed to be bound by their terms. In all events, pursuant to the statute of frauds, such an agreement was required to be in writing and signed by Wise Foods.

Moreover, just because Wise Foods continued to operate out of Hercules' warehouse and collected payments from independent jobbers such as plaintiffs after the Master Agreement had terminated, does not create an obligation to do so forever in direct violation of the statute of frauds. See Miller v. Murray, 68 So. 2d 594, 597 (Fla. 1953) (refusing to take agreement out of statute of frauds since purported part performance were equally consistent with plaintiff's position as with defendant's).

It also does not establish that Wise Foods ratified through performance plaintiffs' agreements with Hercules or Fine Distributing. Agreements for services cannot be taken out of the statute of frauds through evidence of performance. Miller Const. Co. v. First Indus. Technology Corp., 576 So. 2d 748, 751 (Fla. 3d DCA 1991) (doctrine of part performance is not applicable to personal service contracts).

Accordingly, Plaintiffs' allegations fail to state a claim for ratification.

    **3.**    **Plaintiffs James Carney And Dennis Piasio Fail To State A Claim For Reformation.**

As to plaintiffs James Carney and Dennis Piasio, the Second Amended Complaint demands that Wise Foods refund these plaintiffs the purchase price they allegedly paid to Fine Distributing pursuant to their distribution agreements with Fine Distributing.  (See copies of these agreements attached as Exhibits "K" and "O," respectively, to the Second Am. Compl., D.E. #57).   Plaintiffs acknowledge, however, that the purchase price they claim to have paid does not appear anywhere in these agreements.   The Second Amended Complaint alleges that although paragraph 4 in each agreement has "blanks" where the purchase price should have been, and has "inexplicable" lines through it, plaintiffs Carney and Piasio allegedly paid a purchase price of $78,000.00 and $70,000.00, respectively, for their distribution rights.  (D.E. #57, Second Am. Compl., ¶¶ 78 and 97).  In effect, plaintiffs Carney and Piasio seek reformation and ask this Court to insert a price term into a contract in which the price provision was crossed out and has lines drawn through it.

Reformation, however, is limited to situations where, due to mutual mistake, fraud, or inequitable conduct, an instrument as drawn does not accurately express the true intention or agreement of the parties to the instrument.   See Providence Square Association, Inc. v. Biancardi, 507 So. 2d 1366 (Fla. 1987); see also Malt v. R.J. Mueller Enterprises, Inc., 396 So. 2d 1174 (4th DCA 1981).  It is not intended to rewrite a contract by adding a price term into a price provision that was intentionally crossed out by one or both parties at the time the contract was executed.  Tellingly, the Second Amended Complaint is devoid of any allegation that the price provisions were crossed out as a result of mutual mistake, fraud or inequitable conduct.

Simply put, the claims of plaintiffs Carney and Piasio are based on agreements that do not support their claims.

Moreover, plaintiffs Carney and Piasio have waived or are estopped from reforming agreements that they entered into with Fine Distributing approximately 19 years ago.  See, e.g., Thompson v. Gross, 353 So. 2d 191 (Fla. 3d DCA 1977) (creditors who accepted mortgage payments from debtors for a mistaken amount for 17 months before the mistake was found and then took another 10 months to initiate suit waived their rights, or were estopped to assert their rights, to have the instruments modified or reformed).   Waiver and estoppel are especially applicable here where plaintiffs Carney and Piasio seek to reform their agreements with Fine Distributing against Wise Foods, an entity that was not even a party to such agreements – agreements that were executed over 19 years ago.

Accordingly, plaintiffs, Carney and Piasio, fail to state a claim for reformation.

**C.**     **Plaintiffs' Claims Should Be Severed.**

Alternatively, should this Court not dismiss the Second Amended Complaint, Plaintiffs' claims should be severed.  Federal Rule of Civil Procedure 20(a) provides that multiple parties may join in one action if they have claims "arising out of the same transaction, occurrence, or series of transactions or occurrences" and such claims have a common factual or legal basis. "In making a joinder decision, the district court is guided by the underlying purpose of joinder, which is to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits." Swan v. Ray,  293 F.3d 1252, 1253 (11th Cir. 2002).  Claims that have been joined but fail to meet the requirements of Rule 20(a) or fail to achieve the purpose of joinder, may be severed under Federal Rule of Civil Procedure 21.

In the instant case, plaintiffs' claims are not amenable to joinder.  Each claim arises from distinct and unrelated transactions occurring over a twenty year period under which, each plaintiff claims he bought the alleged distribution rights at issue.  Essentially, therefore, while plaintiffs claim to have a common interest in this action, the case will ultimately devolve into five separate cases with different liability and damages analyses required for each of the five claims at issue.

For instance, some plaintiffs entered into distribution agreements with Hercules, while others entered into distribution agreements with Fine Distributing or other unnamed third parties.  How each plaintiff came to own these rights will be subject to separate proof of his dealings with Hercules, Fine or unknown third-parties.  Equally, as to plaintiffs' claims that Wise Foods ratified their contracts, proof of this alleged conduct by Wise Foods will also require separate proof as to each plaintiff.  Further, each plaintiff's damages claims will be completely disparate.  Each plaintiff had a different sales territory with different retailers and different product mixes.  Each plaintiff will have to disclose nonpublic, financial information that is not discoverable by the other plaintiffs.  Each plaintiff had different overhead costs and, there are different contract provisions that will impact on route valuation.  For example, the value of a route operated under a terminable at will contract will obviously be different than a route under a contract with no such provision.

The claims become even more distinct and unrelated with regard to Dennis Piasio and John Stanzione.  As to these two plaintiffs, the Second Amended Complaint appears to be trying to hold Wise Foods liable, not only pursuant to their distribution agreements with Hercules and Fine Distributing, but also pursuant to subsequent agreements that these plaintiffs entered into with Hercules.  For example, the Second Amended Complaint demands that, in addition to the

refund of the purchase price that Plaintiff Piasio allegedly paid Fine Distributing, Wise Foods also pay Plaintiff Piasio a "2 ½ % profit of the gross product sales to stores on his route" that he was allegedly receiving from Hercules pursuant to an agreement with Hercules allowing others to service his route. This agreement is not even attached to the Second Amended Complaint so Wise Foods has no idea what its terms and provisions might be. (D.E. #57, Second Am. Compl., ¶¶ 103 and 114).

Similarly, the Second Amended Complaint demands that Wise Foods pay Plaintiff Stanzione the balance remaining from an agreement he subsequently entered into with Hercules whereby Plaintiff Stanzione allegedly sold his distribution rights back to Hercules. Plaintiff Stanzione alleges that Hercules still owes him $26,385.64 under such agreement and that Wise Foods is somehow liable for the balance even though Wise Foods' Settlement Agreement with Hercules makes clear that Wise Foods did not acquire Hercules' liabilities. (D.E. #57, Second Am. Compl., ¶¶ 124, 125 and 132).

Attempting to resolve each of these five claims in the same action and trial would be inefficient and confusing because the Court will effectively be holding five separate mini-trials under the pretense of one unified proceeding. Therefore, plaintiffs' claims should be severed pursuant to Rule 21 for failure to meet the requirements of Rule 20(a).

## CONCLUSION

For the foregoing reasons, this Court should dismiss plaintiffs' Second Amended Complaint, or in the alternative, sever plaintiffs' claims.

WHEREFORE, Defendant, Wise Foods, Inc., respectfully requests that this Court enter an Order dismissing plaintiffs' Second Amended Complaint, or in the alternative, severing plaintiffs' claims, and granting such further and other relief as this Court deems just and proper.

Dated: February 20th, 2006

Respectfully submitted,

CARLTON FIELDS, P.A.
4000 Bank of America Tower
100 S.E. Second Street
Miami, Florida 33131-9101
Telephone:     (305) 530-0050
Facsimile:     (305) 530-0055
-and-
222 Lakeview Avenue, #1400
West Palm Beach, Florida 33401
Telephone:     (561) 659-7070
Facsimile:     (561) 659-7368

By: _____
CHARLES ROSENBERG
Florida Bar No. 279064
MICHAEL WINSTON
Florida Bar No. 0051403
DANET RODRIGUEZ FIGG
Florida Bar No. 653462

*Attorneys for Defendant*
*WiseFoods, Inc.*

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via U.S. Mail this 20 day of February, 2006 to Scott W. Zappolo, Esq., Watterson & Zappolo, PA, *Counsel for Plaintiffs*, 4100 RCA Boulevard, Suite 100, Palm Beach Gardens, Florida 33410-4247.

_____
Michael K. Winston

## SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT, dated as of March 8, 2002, by and among Hercules Distributing Company, a Florida corporation ("Seller"), and Wise Foods, Inc., a Delaware corporation ("Buyer").

WHEREAS, Buyer and Seller entered into certain loan documents including that certain Hercules Term Credit Agreement (accounts payable), a Subordinated Security Agreement (accounts, inventory, equipment and general intangibles), a ▓▓▓▓▓ Accounts Payable Promissory Note and a Stock Pledge and Escrow Agreement, all dated June 25, 1999, as each has been amended or supplemented prior to the date hereof, by and among Seller and Buyer (collectively the "Wise Loan Documents"), evidencing and securing a $▓▓▓▓▓ inventory loan from Buyer to Seller (the "Wise Loan"); and

WHEREAS, pursuant to that certain letter dated February 16, 2002 (the "Default Letter"), Buyer declared Seller in default of the Wise Loan and informed Seller that it intends to realize upon the collateral under the Wise Loan and otherwise exercise its rights and remedies under the Wise Loan Documents; and

WHEREAS, Buyer has, under the Wise Loan Documents, the right to take possession of all of Seller's assets; and

WHEREAS, pursuant to the Default Letter, Buyer terminated Seller's distributorship of Buyer's products as evidenced by that certain Master Distribution Agreement, dated 1987, as amended, between Buyer and Seller (the "Distribution Agreement"); and

WHEREAS, Seller is a borrower from Hamilton Bank, N.A. ("Hamilton") under certain loan documents executed between Hamilton and Seller as of June 25, 1999, including that certain Term Credit Agreement and other security documents evidencing and securing a loan in the original principal amount of $▓▓▓▓▓ (the "Hamilton Loan"); and

WHEREAS, the actions taken by Buyer under the Default Letter constitute defaults under the Hamilton Loan; and

WHEREAS, given the termination of Buyer's Distribution Agreement, Seller anticipates that it will not be able to make payments due under the Hamilton Loan; and

WHEREAS, key employees of Seller have resigned from Seller's employ as a result of the termination of the Distribution Agreement; and



**EXHIBIT**

_A_

WHEREAS, the independent distributors employed by Seller to primarily market Buyer's products are unable to market such products as a result of the termination of the Distribution Agreement; and

WHEREAS, Seller's inventory is perishable and Seller has no outlets to sell it; and

WHEREAS, Seller's notes receivable from the independent distributors will have no value if they are not sold to Buyer and Buyer has agreed to purchase these notes; and

WHEREAS, Seller desires to protect its ability to pay its debts (including taxes owed to the Internal Revenue Service) to the extent possible; and

WHEREAS, Seller has filed an action against Buyer (the "Lawsuit") in the Circuit Court of the Eleventh Judicial Circuit of Florida, in and for Miami Dade County, Florida, alleging breach of contract and other theories against Buyer; and

WHEREAS, Seller believes that although there may be a possibility of recovery under the Lawsuit, the potential sums recoverable would not be sufficient to relieve it of such debts and obligations as may be achievable in a settlement with the Buyer; and

WHEREAS, Seller believes that although there may be a possibility of recovery under the Lawsuit, the potential sums recoverable would not be sufficient to provide its shareholders with any recovery.

NOW, THEREFORE, Seller, deeming it in its best interests and in the best interests of its shareholders and in consideration of the mutual representations, warranties, covenants and agreements contained herein and intending to be legally bound hereby, agrees with the Buyer as follows:

1.     Closing.  Subject to the satisfaction of the conditions specified below, the transaction shall effectively take place at 12:01 A.M. on the second day following satisfaction of the condition described in Section 3(i), below, or such other time and date as may be mutually agreed upon by Seller and Buyer (the "Closing Date").  The delivery of the instruments and monies prescribed by Sections 7 and 8 shall take place at 10:00 A.M. on the Closing Date at a location mutually acceptable to Buyer and Seller, or such other time and date as may be mutually agreed upon by Seller and Buyer (the "Closing").

2.     Seller's Conditions to Close.  The obligations of Seller to consummate the transactions contemplated hereby are subject to the satisfaction of the following conditions precedent:

(a)     All of Buyer's representations and warranties contained herein shall be true and correct in all material respects as of the Closing Date as though made at and as of the Closing Date;

2

(b)     Buyer shall have performed or complied in all material respects with its agreements and covenants to be performed or complied with on or prior to the Closing Date;

(c)     Buyer shall have delivered the documents specified in Section 7 required to be executed by it;

(d)     Buyer shall have paid the Purchase Price in accordance with Section 8;

(e)     Seller shall have received such other instruments, documents and certificates as it reasonably may have requested; and

(f)     Seller shall have received and approved the Closing Statement (in the form attached hereto as Exhibit A).

3.     Buyer's Conditions to Close.  The obligations of Buyer to consummate the transactions contemplated hereby are subject to the satisfaction of the following conditions precedent:

(a)     All of Seller's representations and warranties contained herein shall be true and correct in all material respects as of the Closing Date as though made at and as of the Closing Date;

(b)     Seller shall have performed or complied in all material respects with its agreements and covenants to be performed or complied with on or prior to the Closing Date;

(c)     All governmental and third party consents and approvals necessary to the consummation of the transactions contemplated hereby shall have been obtained;

(d)     Seller shall have delivered the documents specified in Section 7 required to be executed by it;

(e)     Buyer shall have received certified copies of resolutions of Seller's Board of Directors, authorizing the execution and delivery of this Settlement Agreement and the consummation of the transactions contemplated hereby;

(f)     No investigation, action, claim or proceeding shall have been commenced or threatened which would reasonably be expected to materially effect or prohibit the carrying out of the transactions contemplated by this Settlement Agreement;

(g)    Buyer shall have received and approved the Closing Statement (in the form attached hereto as Exhibit A);

(h)    Buyer shall have received such other instruments, documents and certificates as it reasonably may have requested to effectuate the transactions contemplated herein; and

(i)    Buyer shall have entered into an agreement with Hamilton Bank N.A., and/or the FDIC, as receiver for Hamilton, and/or the current holder of the Hamilton Loan, as described below (collectively "Hamilton") to purchase Seller's entire obligations to Hamilton arising under the Hamilton Term Credit Agreement, the Subordinated Security Agreement (Accounts, Inventory, Equipment and General Intangibles), the ▮▮▮▮▮▮▮ Promissory Note and all Guarantees and other Collateral executed by Seller and/or Seller's Principals in connection with the Hamilton Loan, all dated June 25, 1999, as each has been amended or supplemented prior to the date hereof (collectively the "Hamilton Loan Documents"), and take an assignment of all liens and security interests pertaining to the Hamilton Loan, for an amount acceptable to Buyer, and Hamilton shall have released Buyer from all obligations due under the Guaranty executed by Buyer in connection with the Hamilton Loan.

(k)    Seller shall deliver to Buyer an executed Notice of Voluntary Dismissal with Prejudice of the Lawsuit, in a form reasonably satisfactory to Buyer's counsel, which Buyer will file with the Miami Dade County Circuit Court.

4.    Purchased Assets: Purchase Price.

(a)    Purchased Assets. At the Closing, Seller will transfer to Buyer free and clear of any security interests or other liens, claims or encumbrances, of any kind or type, excluding only the permitted liens, claims and encumbrances set forth in Schedule 4 (a) (iii) attached hereto (the "Permitted Liens"), and Buyer will purchase from Seller the following assets (collectively, the "Business Assets") upon delivery by Buyer of the Purchase Price (as described in subsection 4(c), below):

(i)    Inventories. All of the inventory of supplies, labels, packaging, samples and finished products necessary to or used in the Business and owned by Seller, whether in its possession or otherwise, as described on Exhibit B (collectively, the "Inventory");

(ii)   <u>Receivables</u>.   All of Seller's right, title and interest in all receivables properly recorded, or properly recordable, on the books of the Business at Closing, including without limitation, all accounts receivable, trade accounts, insurance claims and other debts due Seller in connection with the Business, as well as any accounts or notes receivable owed to Seller by any of its jobbers/independent distributors who have agreed to provide services to Buyer as of Closing (the "Jobber Notes"), all as described on <u>Exhibit C</u> (collectively, the "Receivables");

(iii)   <u>Equipment</u>. All of the office machinery, vehicles and other items of machinery or equipment owned and used by Seller in connection with the Business listed on <u>Exhibit D</u> (collectively, the "Equipment");

(iv)   <u>Intangible Property.</u>  All of the following intangible assets and rights of Seller, including documentation relating to such intangibles, which are related to, and necessary to the conduct of, the Business (collectively, the "Intangible Property"):

   (A) <u>Information</u>.  All business information and related books and records necessary for the operation of the Business as currently conducted by Seller, pertaining to advertising, marketing and sales programs and associated art and advertising, mailing lists for the Products and all customer lists and route books currently maintained by Seller (collectively, the "Business Information");

   (B) <u>Licenses</u>.  All transferable licenses owned by Seller as of the date of this Settlement Agreement, including, but not limited to, patents, trademarks, copyrights, technology and Business information granted to Seller by third parties which are necessary to or used in the conduct of the Business as conducted by Seller during the sixty (60) day period preceding the date of this Agreement, and all of Seller's rights, from and after the date of this Settlement Agreement through the Closing Date, whether written or oral, to distribute snack food products under trademarks not owned by, or licensed to, Buyer, including without limitation any other licenses, agreements or arrangements listed on <u>Exhibit E</u>; and

   (C) <u>Other Current Assets</u>.  All transferable slotting allowances,

5

prepaid items and deferred costs associated with the Business;

(v)    Contracts.  All leases or other agreements which Buyer agrees to assume by listing same on the attached Exhibit F (collectively, the "Contracts"); and

(vi)    Cash.  All cash generated from the operations of the Business regardless of where located, including without limitation all cash on hand at any premises of the Business and all cash located in any bank or other accounts maintained for the Business (the "Cash").

(b)    Additional Consideration From Seller.

In addition to the Business Assets set forth above, as additional consideration for the purchase of the Business Assets, the Seller and each of Nicolas, Christos, Paul and Arleen Christodoulou (the "Principals") shall execute and deliver a Release in the form attached as Schedule 4(b) (the "Seller Release").

(c)    Purchase Price.

The purchase price paid by Buyer for the Business Assets shall consist of the sum of (i) the dollar amount required to purchase the Hamilton Loan (the "Hamilton Debt Payment Amount"), plus (ii) the dollar amount equal to fifty percent (50%) of the remainder after subtracting the Hamilton Debt Payment Amount from the "Business Asset Payment Amount" (as such term is defined below), plus (iii) the dollar amount equal to the sum of the weekly cash settlement amounts owed by Buyer to Seller for the weeks ending February 9, 2002, and February 16, 2002, pursuant to the terms of the letter agreements between Buyer, Seller, Publix and Cape Cod, plus (iv) a dollar amount equal to $▓▓▓▓ for the employees of Seller who are not offered employment by Buyer (the "Severance Payment").  The term "Business Asset Payment Amount" means an amount equal to the sum of the fair market value of: (A) the Inventory which is good and salable and has at least twenty-one (21) days remaining code date as of the date of Closing (the "Eligible Inventory"); (B) each Receivable which is good and collectible and has not aged beyond the time period during which the obligor for such Receivable customarily makes payments to Seller (the "Eligible Receivables"); (C) each Jobber Note (provided that the present value of the mandatory interest and principal payments required under the Jobber Notes shall be discounted using a discount factor equal to 14%, in each case), and (D) the

6

Equipment. (The dollar amounts set forth in Section 4(c) and the additional consideration set forth in Section 4(d) below are hereinafter collectively called the "Purchase Price").

The fair market value of the Eligible Inventory, Eligible Receivables, Jobber Notes and Equipment shall be equal to the aggregate values of the Eligible Inventory, Eligible Receivables, Jobber Notes and Equipment which is listed and described in the statement attached as <u>Exhibit A</u> to this Agreement at Closing The "Closing Statement").

The parties further agree that the cash portion of the Purchase Price shall be applied first, to purchase the Hamilton Loan and to obtain a full release from Hamilton of all liability of Seller and any guarantors arising out of or in connection with the Hamilton Loan, second, to pay off all liens and encumbrances (other than the Permitted Liens) on the Business Assets and to obtain a full release of all liability in connection with such liens and encumbrances (or if any of such liens and encumbrances cannot be paid off at Closing, then Buyer shall holdback a sufficient portion of the cash Purchase Price to assure that they are paid in full and upon payment of such liens and encumbrances if any part of such holdback remains, it shall be promptly remitted by Buyer to Seller), third, to the extent that any cash portion of the Purchase Price remains, to Seller's employees not hired by Buyer in accordance with the provisions of Section 4(c)(iv), above, and fourth, to the extent that any cash portion of the Purchase Price remains, by the Seller as it shall deem appropriate (subject to applicable law).

(d)     <u>Additional Consideration From Buyer.</u>

In addition to the payment amounts set forth in 4(c) above, as additional consideration for the purchase of the Business Assets,

(i)     Buyer and its directors, officers, employees, parents, subsidiaries, successors and assigns (collectively the "Buyer Parties") shall execute and deliver at Closing a release in the form attached as <u>Schedule 4(d)(i)(A)</u> (the "Buyer Release") which shall contain the agreement of the Buyer Parties to release Seller's Principals from any obligations arising out of or in connection with the Distribution Agreement, the Hamilton Loan and/or the Hamilton Loan Documents and the Wise Loan and/or the Wise Loan Documents"),

(ii)     The Buyer Parties shall also execute and deliver at Closing a forbearance and release in the form attached as <u>Schedule 4(d)(i)(B)</u> (the

7

"Buyer Forbearance") which shall contain the agreement of the Buyer Parties to forbear any collection efforts or the exercise of any of their other rights against Seller, and its successors and assigns (collectively the "Seller Parties") arising under the Hamilton Loan, and/or the Hamilton Loan Documents, and the Wise Loan, and/or the Wise Loan Documents, for a period of twelve (12) months following Closing, and to release the Seller Parties from any obligations arising out of or in connection with the Hamilton Loan, and/or the Hamilton Loan Documents, and the Wise Loan, and/or the Wise Loan Documents, upon expiration of the foregoing twelve (12) month period; provided, however, that in the event an order for relief is entered in a case commenced by or against Seller under the United States Bankruptcy Code or in the event that any other case is filed in state or federal court seeking to avoid, set-aside, reverse or unwind the transactions described in this Settlement Agreement (collectively a "Court Proceeding") within the twelve (12) month period following Closing, then the obligation of the Buyer Parties to forbear any collection efforts or the exercise of any of its other rights against the Seller Parties under or with respect to the Hamilton Loan, and/or the Hamilton Loan Documents, and the Wise Loan, and/or the Wise Loan Documents, shall terminate immediately and the Buyer Forbearance shall no longer be effective;

(iii)    provided that no Court Proceeding is commenced by or against Seller, during the twelve (12) month period following Closing, then the Buyer Parties shall release the Seller Parties from all obligations under the Hamilton Loan, and/or the Hamilton Loan Documents, and the Wise Loan, and/or the Wise Loan Documents, in which event Buyer shall mark all documents evidencing and securing the Hamilton Loan and the Wise Loan "Cancelled" and record appropriate UCC-3 Termination Statements in the applicable public records of Florida; and

(iv)    if a Court Proceeding is commenced by or against Seller during the twelve (12) month period following Closing, then the Seller Parties shall remain fully liable to the Buyer Parties to the extent set forth under the terms of the Hamilton Loan, and/or the Hamilton Loan Documents, and the Wise Loan, and/or the Wise Loan Documents, and the Buyer Parties shall retain all of their rights against the Seller Parties or any third parties, to the extent set forth under the terms of the Hamilton Loan, and/or the Hamilton Loan Documents, and the Wise Loan, and/or the Wise Loan Documents.

5.    Purchase Price Allocation. The Purchase Price shall be allocated in accordance with the agreement of the parties as set forth on the Closing Statement attached as Exhibit A, and

such allocation will be used by the parties in reporting the transactions contemplated herein for all federal, state and local tax purposes.

6.   <u>No Assumption of Liabilities</u>.  This transaction constitutes a sale of certain assets only. The Buyer is not assuming any liabilities or obligations of Seller of any kind or nature (including trade payables) incurred by Seller in connection with the operation of the Business prior to Closing, or otherwise incurred by Seller, other than the liabilities or obligations expressly assumed by Buyer pursuant to the terms of this Settlement Agreement.  Buyer is not assuming any obligations whatsoever with regard to any of Seller's employees; provided that Buyer shall have the option to make offers to employ any of Seller's employees on and after the Closing. Buyer represents to Seller that any of Seller's employees hired by Buyer shall be provided with the same benefits currently being provided to comparable new employees of Buyer; however, with respect to health benefits such employees will become immediately eligible for coverage without any prior waiting period.   Buyer is not assuming any agreements between Seller and its independent jobbers; however, Buyer shall offer new agreements to each of said independent jobbers on terms reasonably satisfactory to Buyer and, in the case of any independent jobbers who have purchased routes from Seller, such agreements will acknowledge the ownership interest of such independent jobbers in their routes.

7.   <u>Closing Documents</u>. The sale of the Business shall be effectuated by Seller delivering at the Closing of (i) a Bill of Sale duly executed by Seller, conveying the Inventory and Equipment from Seller to Buyer, (ii) an Assignment Agreement duly executed by Buyer and Seller, transferring Seller's rights in the Receivables, Intangible Property and Contracts to Buyer, (iii) executed copies of all consents required or advisable, in Buyer's reasonable discretion, in connection with the assumption of any Contracts by Buyer in accordance with this Settlement Agreement, (iv) a certificate executed by the President of Seller which certificate shall certify the accuracy of the Closing Statement and the satisfaction of the conditions to Closing set forth in Sections 3(a), 3(b), 3(g) and 3(k), (v) releases of all liens, claims or encumbrances (excluding only the Permitted Liens) on any of the Business Assets, duly executed by the applicable lienholders, and (vi) the Seller Release, duly executed by Seller and its Principals. Each of the Closing documents referenced in this Section 7 shall be in a form reasonably satisfactory to Buyer and Seller. In addition, at the Closing, Buyer shall deliver possession of all of the Business Assets.

8.   <u>Payment of Purchase Price; Closing Documents</u>.  At the Closing, immediately subsequent to the delivery of all instruments set forth in Section 7, Buyer shall deliver to Seller the cash portion of the Purchase Price (less the reductions described in Section 8(a) and subject to the post Closing adjustment described in Section 8(b), below) and the Buyer Release duly executed by Buyer.   The cash portion of the Purchase Price, delivered by Buyer to Seller as set forth in Section 4(c), above, shall be reduced by the amount of the Cash, as described in Section 4(a)(vi), above (and Seller shall retain possession and

ownership of such Cash), and by any prorated amounts required pursuant to the provisions of Section 16, below.

9.     Good Title.  Except for Permitted Liens, Seller has, and will convey to Buyer at Closing, good title to all the Business Assets, free and clear of any security interest or other lien, claim or encumbrance of any kind or type (excluding any such liens or encumbrances which benefit Buyer only).

10.    Inventory.  All Inventory in warehouses serving the Business shall be made available for Buyer's pickup effective immediately upon Closing.  Buyer shall pay any third-party storage costs on Inventory which is not available for Buyer's pickup immediately upon Closing and which shall accrue after Closing.

11.    Financial Statements.  The annual financial statements which Seller has delivered to Buyer with respect to the operations of the Business were prepared in accordance with GAAP and all interim and preliminary financial statements which Seller has delivered to Buyer with respect to the operations of the Business were prepared in accordance with Seller's internal accounting records (such annual and interim financial statements being hereinafter collectively called the "Financial Statements").  Except as otherwise specifically indicated, such Financial Statements have not been audited.  Each Financial Statement presents fairly the financial conditions and results of the operations of the Business listed thereon as of the dates and for the periods indicated, and taken as a whole is, in all material respects, true, correct and complete and prepared in conformity with Seller's prior accounting policies and practices applied on a consistent basis.

12.    Representations and Warranties.  The sale of the Business Assets provided for herein is made "AS IS" AND WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT), EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY REPRESENTATION OR WARRANTY AS TO CONDITION, DESIGN, OPERATION, FITNESS FOR USE OR FITNESS FOR ANY PARTICULAR PURPOSE.

13.    Conduct of Business. Seller covenants that from the date hereof until the Closing it will make best efforts to continue, in a manner consistent with Seller's past business practices, to maintain and preserve intact the Business and to maintain the ordinary and customary relationships of the Business with its suppliers, customers and others having business relationships with it with a view toward preserving for Buyer to and after the Closing Date the Business, the Business Assets and the goodwill associated therewith.  From the date hereof until the Closing Date, Seller will continue to operate and conduct the Business in the ordinary course, Seller will continue to maintain its books and records in accordance with its past practices and in a manner consistent with the accounting policies

and practices used in the preparation of its Financial Statements, and Seller will not, without the prior written approval of Buyer or as otherwise contemplated by this Agreement:

    (a)    sell, transfer, lease to others or otherwise dispose of any of the Business Assets, except for the sale of any non-"Wise" branded Inventory in the ordinary course of the Business;

    (b)    make any payment to any person or entity for any purpose whatsoever, including without limitation;

        (i)    payments to suppliers of the Business in the ordinary course;

        (ii)    payments made in connection with any contractual obligations incurred by the Business in the ordinary course; and

        (iii)    payments made to or in connection with any employees of the Business in the ordinary course;

    (c)    accept or agree to accept any payment from any creditor of the Business for any Receivables in an amount less than the full book value of such Receivables, without giving effect to any reserves, write-downs or write-offs pertaining to such Receivables; or

    (d)    enter into any contract or lease or take any action which if entered into or taken prior to the date hereof would be required to be disclosed on any Schedule to this Agreement or would be inconsistent with any of the representations and warranties of Seller in this Agreement.

14.    <u>Investigation of Business</u>.  Buyer may, prior to the Closing Date, make or cause to be made such investigation of the business, properties and employees of the Business and of its financial and legal condition as Buyer deems necessary or advisable.  Seller will permit Buyer and its authorized agents or representatives, including its independent accountants, to have full access to the employees, properties, books and records of the Business during all reasonable hours to review information and documentation relative to the properties, books, contracts, commitments and other records of the Business. Buyer and Seller will fully cooperate with each other and their respective counsel and accountants in connection with any steps required to be taken as part of their obligations under this Agreement.  Nothing contained in this Section 14 shall permit the Buyer access to financial data of employees to the extent prohibited by applicable law without the prior written consent of each such employee.

15.  Public Disclosures.  Prior to, on or after the Closing Date, Seller and its Principals will not, except as provided by law, (i) contact any of Seller's major customers or suppliers for any purpose whatsoever, or (ii) issue any press release or make any other public disclosures or statements concerning this transaction or the contents of this Agreement without the prior written consent of Buyer.  At no time, whether before or after the Closing Date, shall Buyer, Seller or any of their respective principals make or publish any disparaging statements about the other.  Notwithstanding the above, nothing in this Section 15 will preclude any party from making any disclosures required by law or regulation or necessary˜and proper in conjunction with the filing of any tax return or other document required to be filed with any federal, state or local governmental body, authority or agency.

16.  Risk of Loss.  Seller shall bear all costs and expenses of the operation of the Business, including those arising out of or in connection with any Contract and all risk of destruction, theft, loss or damage to the Business Assets arising and/or occurring prior to the Closing Date.  Buyer shall bear all costs and expenses of the operation of the Business, including those arising out of or in connection with any Contract and all risk of destruction, theft, loss or damage to the Business Assets arising and/or occurring on or after the Closing Date.  In the event any Business Assets are destroyed, stolen, lost or materially damaged subsequent to the date hereof and prior to Closing, Seller shall notify Buyer of such event, and Buyer may, at its option, elect not to purchase said Business Assets, in which case, Buyer shall cease to be under any obligation to purchase, and Seller shall cease to be under any obligation to sell, such Business Assets, and the Purchase Price shall be adjusted by an amount equal to the value of such Business Asset(s) as set forth herein. The Purchase Price shall be adjusted to prorate between Buyer and Seller, as appropriate, any obligations arising under (i) the Contracts or (ii) in respect of any utility charges incurred by the Business through the Closing Date; and, subject to such proration, Buyer agrees to indemnify, defend and hold Seller harmless from and against any obligations arising out of or in connection with such Contracts and utility charges after Closing.  The Closing Statement shall set forth a detailed calculation of all such obligations through the Closing Date.

17.  Confidential Information.  Seller and Seller's Principals shall maintain the Intangible Property including all trade secrets and other proprietary know-how (collectively, the "Confidential Information) in confidence in accordance with its past business practices for maintaining the confidentiality of such Confidential Information.  This confidentiality obligation will not extend to information which is either public information, becomes public information subsequent to its submission to Buyer (other than through a breach of Seller's obligations under the terms of this Settlement Agreement), or is obtained by Seller from a third party which has a lawful right to disclose such information.

12

18. <u>Trademarks.</u>  To the extent any trademarks, trade names and/or logos owned by Seller (not described in <u>Exhibit E)</u> appear on any documents, products, or other materials used in the operation of the Business including, without limitation, inventories, sales material and letterheads in existence on the Closing Date, Seller hereby grants to Buyer a license, for no additional fee, to use such trademarks, trade names and/or logos on such documents, products or other materials until depletion; provided, however, that in no event shall Buyer use any of said trademarks, trade names and/or logos after the twelve (12) month period following Closing and after such twelve (12) month period, Buyer shall destroy all remaining materials containing such trademarks, trade names and/or logos.

19. <u>Trade Debts.</u>  Seller hereby represents and warrants that (a) all of its trade creditors (excluding Buyer) are listed on <u>Exhibit G</u>, and (b) Seller has no unpaid trade debts or obligations except as listed on <u>Exhibit G</u>.  Seller agrees that (x) Buyer shall assume no obligations under this Settlement Agreement with regard to Seller's trade creditors, employees or taxes, and (y) it will cooperate with Buyer to comply with the requirements of any and all laws relating to bulk sales prior to Closing.

20. <u>Authorization.</u>  Each party hereto hereby represents and warrants to the other that (a) it has all requisite corporate power and authority to enter into this Settlement Agreement and to fulfill all of its covenants and obligations hereunder, including the purchase and sale of the Business Assets contemplated hereby; (b) this Settlement Agreement constitutes the valid and binding obligation of such parties, enforceable in accordance with its terms; and (c) this Settlement Agreement and the consummation of the transactions contemplated hereby have been duly authorized on behalf of such party by all requisite corporate action.  Each party hereto further represents and warrants that the execution and delivery of, and the performance of the transactions contemplated hereby does not violate, conflict with, breach or constitute a default under the terms, conditions or provisions of (i) the certificate of incorporation or by-laws of such party; (ii) any document, agreement or other instrument to which such person is a party or by which it or its assets may be bound; or (iii) any judgment, injunction, writ, decree, order or ruling of any court or governmental authority binding upon such party.

21. <u>Expenses.</u>  Seller and Buyer shall each pay their respective expenses (such as legal, investment banker and accounting fees) incurred in connection with the origination, negotiation, execution and performance of this Agreement.  Each of Buyer and Seller represent to the other that it has not engaged any broker, investment banker or finder to whom a commission is or will be owed as a result of the transactions set forth herein.

22. <u>Assignment.</u>  Neither party may assign this Settlement Agreement, or any interest herein, without the prior written consent of the other party, which consent may be withheld for any reason. However, Buyer may assign its rights hereunder to any of its subsidiaries,

13

affiliates or lenders without such prior consent, provided that Buyer absolutely and unconditionally guarantees the prompt and continuing performance of all Buyer's representations, warranties, covenants and obligations by such assignee.

23.    Entire Agreement.   Except as otherwise expressly provided herein, there are no representations or warranties made by either party with respect to the subject matter hereof. This Settlement Agreement (which includes all of the Exhibits referenced herein) constitutes the entire agreement of the parties with respect to the subject matter hereof and may be modified only by a written instrument signed by both parties.

24.    Indemnification.

    (a)    Seller hereby agrees to indemnify, defend and save Buyer, its officers, directors, employees, shareholders, agents and other representatives (each, a "Buyer Party") harmless from and against all claims, suits, losses, damages and expenses including, without limitation, reasonable attorney's fees (collectively, "Losses"), that any Buyer Party may suffer, sustain, incur or become subject to at any time, or from time to time, as a result of (i) Seller's breach of any representation, warranty or pre-closing covenant made by Seller in this Settlement Agreement; (ii) any liability or obligation of Seller described in Section 6 hereof, not expressly assumed by Buyer hereunder; (iii) any product liability arising out of any negligent act of Seller with respect to the storage, handling or shipment of such products prior to Closing or (iv) any claim brought in any subsequent bankruptcy or other court proceeding filed by Seller seeking avoidance or set-aside of this transaction.

    (b)    Seller's foregoing obligation to indemnify Buyer shall survive for a period of 12 months after the Closing subject to each of the following limitations:

        (i)    Seller's indemnification obligation to the Buyer Parties (A) arising under subsection 24(a)(iii), regarding product liability, and under Section 9, regarding good title, shall survive for a period of 5 years from the Closing; (B) arising out of Seller's breach of its representations and warranties in Section 27 regarding taxes shall survive for the applicable statutes of limitation; and (C) arising out of any fraud committed by Seller shall survive forever.  No claim for the recovery of Losses may be asserted by Buyer after the expiration of any specified time period; provided, however, that claims first asserted in writing within such period shall not thereafter be barred; and

14

(ii) No reimbursement for Losses asserted against Seller under Section 24(a) shall be required unless and until the cumulative aggregate amount of such Losses equals or exceeds Twenty Five Thousand Dollars ($25,000) (the "Threshold") and then only to the extent of that portion of the cumulative aggregate amount of Losses (as finally determined) which is in excess of said Threshold; provided, however, that any Losses for the matters described in Sections 24(b)(i) shall not be included in the calculation of such Threshold, or limited thereby;

(c) Buyer hereby agrees to indemnify, defend and save Seller, its officers, directors, employees, shareholders, agents and other representatives (each a "Seller Party") harmless from and against all claims, suits, losses, damages and expenses including, without limitation, reasonable attorneys' fees at trial or appellate levels, that any Seller Party may suffer, sustain, incur or become subject to at any time, or from time to time, as a result of (i) Buyer's breach of any representation, warranty or covenant made by Buyer under this Settlement Agreement; or (ii) any product liability arising out of any defect or hazard connected with any products manufactured, marketed or sold by Buyer (except as otherwise noted in Section 24(a)(iii) above);

(d) The indemnifying party shall not have any obligation to indemnify the indemnified party pursuant to the provisions of this Section 24 unless the indemnified party provides the indemnifying party with (i) prompt written notice of any claim, suit, loss, damage or expense for which indemnity is claimed; and (ii) the opportunity to negotiate, compromise settle and/or defend such claim, suit, loss, damage or expense. Notwithstanding the foregoing, the indemnifying party shall not be entitled to control the defense of any matter for which indemnity is claimed unless it shall first have acknowledged in writing its obligation to indemnify the indemnified party from all Losses. If the indemnifying party elects to control the defense of any such matter, it shall do so with counsel reasonably satisfactory to the indemnified party; provided however, that no indemnifying party shall compromise or settle any claim hereunder without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld. The parties will cooperate fully in any such action and shall make available to each other any books or records useful for the defense of any such proceeding. If the indemnifying party fails to acknowledge in writing its obligation to defend against such proceeding within thirty (30) days after receiving notice thereof from the indemnified party (or such shorter period specified in the notice as the

circumstances may dictate), the indemnified party shall be free to dispose of the matter, at the expense of the indemnifying party, in a reasonable manner.

25.   Intentionally Omitted.

26.   Business Information.  Notwithstanding anything herein to the contrary, when reasonably necessary for legitimate business purposes, (a) Seller may retain copies of the Business Information delivered to Buyer pursuant to this Settlement Agreement; (b) with Buyer's consent, Seller may retain the originals of certain Business Information not delivered to Buyer; and (c) Seller may deliver the only copy of certain Business Information to Buyer. Therefore, the parties mutually agree that subsequent to Closing (i) they each shall provide the other party with access to the Business Information in their possession at all reasonable times for inspection and copying for legitimate business reasons including but not limited to the preparation of tax returns or the defense of litigation; and (ii) they shall not disclose any Business Information to any third parties, except as otherwise required by applicable law.

27.   Taxes.  Except as set forth on Schedule 27 attached hereto, Seller has timely paid all federal, state, local or foreign taxes resulting from or attributable to the Business and has timely filed all tax returns required to be filed with respect to such taxes. Seller shall be responsible for the payment of all sales and transfer taxes, if any, which may be payable with respect to the consummation of the transactions contemplated by this Agreement. Seller shall remain liable and shall indemnify Buyer (and Buyer assumes no liability) for any and all federal, state, local or foreign taxes, including interest, penalties, costs and expenses thereon, resulting from or attributable to the operation of the Business through the Closing Date or the sale of the Business Assets hereunder. Buyer shall provide Seller with a Resale Tax Exemption Certificate, and cooperate with Seller in any other appropriate action required to avoid the imposition of a sales tax on the transfer of the Business Assets.

28.   Further Assurances.  Upon request from time to time, Seller and its Principals shall execute and deliver all documents and do all other acts that may be reasonably necessary or desirable, in the reasonable opinion of counsel for Buyer, to perfect or record the title of Buyer to the Business Assets transferred or to be transferred under this Agreement, or to aid in the prosecution, defense, or other litigation of any rights arising from said transfer (provided that Buyer shall reimburse Seller for all out of pocket costs and expenses resulting from any such request). To the extent any of the Business Assets are not assignable to Buyer or if any necessary consent to such assignment shall not have been obtained by Seller, such Business Assets shall be deemed not to have been assigned to Buyer and Seller shall hold in trust for the benefit of Buyer all of Seller's right, title and interest to such Business Assets and, insofar as permissible, from time to time assign

16

such interest to Buyer.  Buyer and Seller shall cooperate in any reasonable arrangement to the end that Buyer shall be provided the use and benefits of such Business Assets. Nothing in this Paragraph 28, however, shall release Seller from its obligation to defend, indemnify and hold Buyer harmless from any loss, liability or damage suffered by Buyer resulting from any failure by Seller to transfer and assign the Business Assets as required by this Agreement.  This Agreement shall not constitute any agreement to assign any Business Assets if the attempted assignment thereof would constitute a breach thereof.

29.   Governing Law.  This Settlement Agreement shall be governed by, and construed in accordance with the laws of the State of Florida (without regard to the conflicts of laws principles thereof) and in the event that either party shall adjudicate any dispute arising out of or in connection with this Agreement, each of the parties hereto hereby agrees to WAIVE TRIAL BY JURY.

30.   Termination.  This Agreement may be terminated at any time upon the mutual written agreement of the parties, or by either party if the Closing described in this Agreement fails to occur on or before March 31, 2002, unless the party so seeking to terminate shall have materially breached the terms of this Agreement.

31.   Counterparts.  This Settlement Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same document.

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement as of the date first above written.

WISE FOODS, INC.

By: _____

Name: _T E. Van Antica_

Title: _____CFO_____

HERCULES DISTRIBUTING COMPANY

BY: _____

Name: _Nicolas Christodula_

Title: _Chairman_____

UNDERSTOOD AND AGREED TO AS OF THIS ____ DAY OF MARCH, 2002 BY SELLER'S PRINCIPALS, AS TO THOSE SECTIONS WHICH BY

17

THE TERMS OF THIS AGREEMENT SPECIFICALLY BIND SUCH
PRINCIPALS:

_____
Nicolas Christodoulou

_____
Christos Christodoulou

_____
Paul Christodoulou

_____
Arleen Christodoulou